844 So.2d 1117 (2003)
STATE of Louisiana
v.
Elridge MENARD.
No. 02-1182.
Court of Appeal of Louisiana, Third Circuit.
May 7, 2003.
*1119 Thomas M. Calogero, Regan & Associates, New Orleans, LA, for Defendant/Appellant, Elridge Menard.
J. Phil Haney, District Attorney, Robert C. Vines, Assistant District Attorney, Martinville, LA, for Appellee, State of Louisiana.
Court composed of JIMMIE C. PETERS, MARC T. AMY, and ELIZABETH A. PICKETT, Judges.
ELIZABETH A. PICKETT, Judge.

FACTS
This is a pre-trial writ application. Elridge Menard[1] is charged with racketeering in violation of La.R.S. 15:1351, et seq. and with illegal possession of stolen things in violation of La.R.S. 14:69.
On April 4 and April 10, 2002, the trial court heard two motions filed by the State. In the motions, the State sought the discovery as well as admissibility of communications that may otherwise be subject to the attorney-client privilege. On August 23, 2002, the trial court ruled on both motions. It is from the trial court's ruling on these motions that Elridge Menard seeks writs of review.
On January 17, 2003, this court granted the writ to docket, stating, "The trial of this matter is stayed pending further orders of this court. The instant writ application is hereby granted for the purpose of consideration of this matter on the merits." State v. Menard, an unpublished writ bearing docket number 02-1182 (La.App. 3 Cir. 1/17/03).

ASSIGNMENTS OF ERROR
The relator has set forth three assignments of error:
1) The trial court erred in its finding that the State proved, by a preponderance of the evidence, that a criminal conspiracy existed between Elridge Menard and his attorney, Glenn Soileau.
2) The trial court erred in ruling that the attorney-client privilege between Glenn Soileau and Elridge Menard was consequently vitiated.
3) The trial court erred on ruling that all the attorney-client communications between Glenn Soileau and Elridge Menard are subject to discovery by the State and use at trial.
ASSIGNMENT OF ERROR NO. 1:
The defendant contends that the trial court erred in finding that a criminal conspiracy existed between him and his attorney, thereby vitiating his attorney-client privilege and facilitating the admissibility of statements as non-hearsay at trial. The trial court's finding was precipitated by two motions filed by the State. On March 6, 2002, the State filed a Motion to Determine Status of Counsel. The State urged the court to find that no attorney-client relationship existed or had existed between Menard and Soileau for both the racketeering and the illegal possession of stolen things charges. Thus, Soileau could be compelled to testify at Menard's trial as *1120 well as disclose his files, papers, documents, receipts, correspondence and memoranda prepared in connection with his alleged representation of Menard. Subsequently, on March 28, 2002, the State filed a "Motion for Pretrial Determination of Establishment of Prima Facie Case of Conspiracy pursuant to Louisiana Code of Evidence Article 801D(3)(b)." In this motion, the State notified the defense of its intent "to introduce statements of declarants while participating in a conspiracy to commit a crime and in furtherance of the object of the conspiracy pursuant to LSA C.E. Art. 801D(3)(b)." Asserting that the trial court first had to make a determination that a prima facie case of conspiracy existed, the State asked the court to make such a determination. Both motions were presented to the trial court at a hearing held April 4 and April 10, 2002. In a written ruling rendered on August 23, 2002, the trial court found that an attorney-client relationship did exist between Menard and Soileau but that the attorney-client privilege was vitiated because the two men were engaged in a conspiracy to conceal Menard's participation in criminal activities. The court found that communications between Menard and Soileau that would otherwise be protected are subject to discovery by the State and may be used at trial, subject to the applicable rules of evidence.
The following factual assertions were derived from testimony presented at the hearing on the motions.
On May 18, 1999, detectives with the Lafayette Parish Sheriff's Office (LPSO) and the St. Martin Parish Sheriff's Office (SMSO) went to Kyle Jones' house to investigate his involvement in a rash of thefts at construction sites. Soileau testified that he was asked to go to Kyle's house and advise Kyle of his rights. According to Soileau, Menard assisted Kyle's father, Joe Jones, in contacting Soileau. Soileau went to Kyle's house, advised him of his rights and talked to him on the phone the following day, but apparently did nothing further to represent Kyle. Soileau thought that he remembered Kyle making a statement naming Menard as a person to whom he had sold stolen materials. According to Soileau, he also represented Menard in connection with the charge of possessing stolen goods. Soileau's representation of Menard began sometime before June 15, 1999, on which date, Menard paid Soileau $2,000.00. Menard fired Soileau during the first part of July, and Soileau refunded Menard $1,000.00 on July 12, 1999.
According to Soileau, the day after he went to Kyle's house and advised Kyle of his rights, he met Detective Tom Kyle Manceaux of the Lafayette Police Department his office and Detective Manceaux informed him that he believed that Menard possessed some of the stolen flooring. Soileau then called Menard, allegedly to get in touch with Joe Jones. When asked why he didn't call Joe directly, Soileau indicated that he was not sure how to get in touch with Joe and that Joe had told Soileau that Menard could reach him. After Soileau talked to Joe, Detective Manceaux asked Soileau if he would help recover some of the property that may still be in the possession of Menard or Kyle. Soileau agreed as long as Kyle had no problem with it. At Detective Manceaux's request, Soileau talked to Kyle on the telephone. Because, according to Soileau, Joe and Kyle had indicated that the wood flooring was still in storage, Soileau asked Kyle where the key to the storage building was. Kyle said he did not have a key but instructed Soileau to talk with his father.
Kyle testified differently as to his phone conversation with Soileau. Kyle testified as follows:

*1121 Well he called and Garland answered the phone and he handed the receiver to me and he said my lawyer was on the phone. So the first thing I said was, "Glenn, you gonna get me out." He said, "Yeah. I am working on it right now. Where is the key?" So I said, "What key?" He said, "Yeah, that is the key." I said, "What are you talking about, man?" He said, "Oh, where you have it hidden." I said, "Man, I don't know what you are talking about." Then after so long I asked him, I said, "Are you talking to a one-sided conversation?" He said, "Yeah, Kyle." I said, "Well, whenever you ready, hang up the line." So I just put the phone on the desk. And when Garland picked it up, he had hung up. And the next thing I know, I was being charged for items out of a storage bin.
When Kyle told Lieutenant Marcus Guidry of the SMSO about this conversation, Lieutenant Guidry checked all of the storage facilities in the Breaux Bridge area and could not find any that belonged to Kyle. He did find, though, that Menard had a storage facility.
Special Agent Garland Jean Batiste of the Federal Bureau of Investigation testified that he was present on May 19, 1999, when Kyle was being interviewed in the Lafayette Parish Correctional Center. Agent Batiste recalled Kyle receiving a phone call during the interview. Agent Batiste remembered Kyle stating the following:
He continuously said to the other party on the, on the phone that "You got to be, you got to be joking. You want, you want me to say that there's a key." And so afterwards I asked him, I said, "Well, you know, what was that phone conversation about?" and he said, "Well, that was my attorney Glenn Soileau and he wanted me to admit to having a key and I had no idea what he was talking about."
During his own testimony, however, Soileau denied hearing Kyle say that he did not know what Soileau was talking about. Soileau also denied hearing Kyle ask if Soileau just wanted Kyle to go along with that story. Trying to remember the conversation, Soileau testified that when he asked Kyle if he had a key to the storage building, Kyle said he did not but instructed Soileau to call his father. Soileau later testified that he thought Kyle also asked, "What storage building?"
The State asked Soileau to read the following statement he made in a response to a complaint filed against him with the Louisiana Disciplinary Board: "He [Kyle Jones] stated that he had [sold the stolen property] and/or placed it on his father's property in Cecilia."it appears that Soileau wasn't even able to read correctly from something that he wrote. Soileau acknowledged that there is no mention of a storage facility in the statement. When the State asked Soileau why he called Kyle Jones in jail to ask him about a key to a storage facility, the following colloquy took place:
A Because that's what I believed at the time Mr. Vines. When he said he had it in storage
Q How did you come to that conclusion?
A Because when he said it he had it in storage I assumed that it was in a storage building and it was locked. I didn't assume that he had stored on, on property outside of a building. Iwhen you say I have something in storage I, I assumed it was in storage building and locked.
Q Well, what your response says that he told you that the stolen property was placed on his father's property in Cecilia.

*1122 A Yeah. Does that say it's a storage building or no storage building? It doesn't
Q No it does not. That's exactly my point, Mr. Soileau.
That, that
Q What led you to the conclusion that it was in a locked storage facility?
A Well because he said it was stored on his father's property in Cecilia.
Q That's not what you say he said in this official response
A He stated
Qto the Bar Association.
A Well I don't want to argue. It says he stated that he had stolen the property and placed it on his father's property in Cecilia.
Q And if he told you that he had placed the property, the stolen property on his father's property in Cecilia, if he told you that as you indicate in this letter, why would you testify earlier and why did you contact Kyle Jones at the jail and ask him about a key to a storage facility?
A Because I didn't think he stored anything, I don't think, when you store something you just put it on a lot, an open lot. I assumed it was in a building stored in Cecilia. I told you that three times.
Soileau testified that, in accordance with Kyle's instructions, Soileau contacted Joe Jones, but, as far as Joe knew, the flooring and any other items were located on property in Cecilia. Soileau testified that Joe asked him if he could borrow his truck to retrieve some of the items. Soileau testified that he left the truck for someone to pick up and when he returned later, the truck had been returned and detectives were unloading it. According to Soileau, he expressed concern to Detective Manceaux over the fact that stolen items would be in his truck. Soileau did not want to be charged with possessing stolen things.
Detective Manceaux testified differently as to what occurred during his meeting with Soileau on May 19, 1999. Prior to the meeting, the detective interviewed an informant concerning the activity at issue. The informant told the detective that she saw wood flooring at Kyle Jones' residence, but the wood flooring disappeared after Menard paid money to Kyle. In her statement, the informant stated that she was at Kyle's residence one day when Menard came over to pay Kyle money. Kyle told the informant to hide. Peeping through the window, the informant saw Menard give Kyle $40.00, which Kyle later gave the informant to buy crack. When asked if she knew what the money was for, the informant stated, "It was probably for the wooden floor that he bought from Kyle because the six boxes I seen wasn't there anymore ... [a]nd the two doors." The informant, however, did not actually see Menard load the materials. When asked if she had seen any other type of material at Kyle's house, the informant responded, "Nope, but I heard that they keep the two by fours to a trailer ... in a trailer."
After this interview, Detective Manceaux went to Soileau's office to discuss recovering the stolen items from Menard. According to Detective Manceaux, Soileau asked his secretary to get Menard's number and supposedly contacted Menard while the detective waited in the foyer. Detective Manceaux testified that Soileau then left the office for approximately an hour. During his own testimony, however, Soileau did not recall whether he left his office for an hour after he talked to Menard. According to Detective Manceaux, when Soileau returned, he told the detective that Menard had not purchased the wood flooring from Kyle and that Kyle knew where the remaining wood flooring *1123 was located. Soileau also stated that the flooring was located in locked storage. Knowing that Kyle was at the Lafayette Parish Correctional Center, Detective Manceaux contacted Kyle and had Soileau talk to him. It appeared to the detective that Soileau learned the location of the key so that he could retrieve the wood flooring from the storage location. Soileau then asked the detective to meet him back at the office around six o'clock that evening. Before he left, Soileau expressed concern with possessing stolen property, but Detective Manceaux assured him he would have no problem if he recovered the wood from Kyle Jones' storage location. Detective Manceaux also testified that Soileau had indicated throughout the matter that he was willing to cooperate and return the property to the rightful owners and that Kyle was cooperating based upon his advice.
According to Detective Manceaux, when he returned to Soileau's office at 6:00 p.m., Soileau was not present. The State asked Detective Manceaux if he began unloading the stolen items from Soileau's truck before Soileau arrived, and Detective Manceaux responded, "No, sir." According to Detective Manceaux, Soileau arrived with an unknown male, and the three men moved the lumber to the truck driven by Detective Manceaux. Detective Manceaux's report indicates that he arrived at Soileau's office at 6:00 p.m. and that Soileau arrived at the office at 6:04 p.m. in his wife's car. Soileau and his friend then helped Detective Manceaux load the items into the detective's car. According to the report, the detective had noticed that Soileau's truck had been parked under a rear garage at the office, and the truck was loaded with many boxes of wood flooring and seven white interior style doors. At the hearing, Detective Manceaux testified that because he was specifically concerned about an expensive Mahogany door, he asked Soileau if he had seen the door. According to Detective Manceaux, Soileau responded "that he took everything out of storage and that he did not see the Mahogany door with the glass insert, this is all he saw."
During his own testimony, however, Soileau denied going to the storage facility and retrieving the wood flooring as well as the seven interior doors turned over to the detectives. In fact, Soileau testified that he left his truck for someone to use to retrieve the stolen items and that when he returned to his office, the detectives were already unloading the items. Explaining why Detective Manceaux would have thought that Soileau himself retrieved items from the storage facility, Soileau stated that he told Detective Manceaux that, "They said there was nothing else." When asked on cross-examination if he knew for certain that Soileau was the person who actually moved material from the storage room to his truck rather than having someone else do it, Detective Manceaux replied that he could not say for certain but, "Based upon what Mr. Soileau told me after I asked him the question did he see the glass door, I surmised that Mr. Soileau was at the storage location and actually took the lumber and the doors.... A reasonable person would surmise that, and that is what I surmised."
Subsequently, the court asked Detective Manceaux if he had any doubt that when Soileau made his statement he was telling the detective that he had "actually gone to the storage location and personally took himself, or he by himself, or he along with someone else to help him, personally had done [sic] to this storage site and place the items in his truck and drove the items back to his office." Detective Manceaux had no doubt about his conclusions.
*1124 According to Lieutenant Guidry, another investigator, Soileau stated that he let Menard borrow his truck on May 19, that Menard went somewhere, and that the truck appeared an hour later back under a shed with the items. During his own testimony, however, Soileau denied telling Lieutenant Guidry that he gave Menard his truck on May 19, 1999, in order for Menard to retrieve the stolen materials.
Finally, Detective Manceaux testified that during the investigation, Soileau told him that he represented Kyle Jones, but he did not tell the detective that he represented Menard. When asked if he knew of any investigation involving a conspiracy between Soileau and Menard, Detective Manceaux stated that he was not involved in such an investigation but knew that the District Attorney was concerned about Soileau's involvement.
Lieutenant Guidry was also involved in the investigation of the thefts at issue. According to Lieutenant Guidry, Soileau had denied representation of Menard on two occasionsonce on May 18 and once on June 14, 1999. On June 14, 1999, Lieutenant Guidry called Soileau and asked Soileau if he was representing Menard. Soileau indicated he would not be representing Menard unless he received payment. During the same conversation, Lieutenant Guidry pleaded for Soileau's cooperation in the matter. Soileau promised to speak with Menard, and, about ten minutes later, Menard called Lieutenant Guidry. Menard met with Lieutenant Guidry at the lieutenant's office and consented to an interview. During his own testimony, Soileau stated that he prompted Menard to contact Lieutenant Guidry on June 14 because he was representing Menard.
Lieutenant Guidry again spoke with Soileau on June 17, at which time he testified that the following occurred:
A. I had spoke to Glenn previous that day. I explained to him what I was investigating and that I had information that Eldridge Menard may have purchased building materials from Kyle Jones and I was asking Mr. Soileau if he would speak to Eldridge Menard and have him cooperate with me, at that point we were only interested in recovering any property from Lafayette. Glenn said he would speak to him and he would get back with me that morning. The day went by and it was later that afternoon and I hadn't heard from Glenn. I went to his office. He wasn't there. I drove over to his house to speak to him there. When I was coming around the block I saw Eldridge Menard backing out of Glenn Soileau's driveway. He was driving his vehicle and Pauline was a passenger.
Q. Who was with you at that time?
A. Arthur Boyd.
Q. Sgt. Boyd?
A. Yes.
Q. And had you been following Eldridge Menard around Breaux Bridge that day?
A. No.
Q. In fact, you were trying to locate Eldridge Menard that day; correct?
A. Yes.
Q. So had you located him some place, you would have stopped him to talk to him?
A. Yes.
Q. Okay. Now you say on that day, June 17th 1999, Mr. Soileau indicated to you again that he did not represent Eldridge Menard?
A. Yes, that is correct.
Q. You requested his assistance in trying to locate Eldridge Menard so that you all could perhaps further ya'll's investigation *1125 and talk to him some more about this case?
A. Yeah. Glenn asked me essentially what I wanted in this investigation and I told him. I gave him a verbal list of some of the items I was looking for. I told him that we had information that he had purchased these items, and he said he would talk to Eldridge Menard and try to solicit his cooperation in this, and he would get back with me.
Q. Okay. And the day passed and no one had contacted you, so you went to look for Glenn Soileau?
A. Yes.
Q. Now when you saw Eldridge Menard and you said who was with Eldridge Menard at the time?
A. All I saw in the vehicle was Eldridge Menard driving and Pauline was a passenger.
Q. And what vehicle was that?
A. It was a white Expedition, Eldridge Menard's vehicle, or Explorer. I don't remember. It was a large white SUV.
Q. And what did you do at that point?
A. I pulled upHe continued backing out of the driveway and he proceed to the intersection of Rees Street. I pulled in behind him and he turned right. I pulled onto Rees Street and I pulled in behind him and I have emergency flashers on my carmy emergency lights, not my flashers.
Q. Explain to the Court what type of emergency flashing lights you have on your vehicle?
A. I have white illuminating strobes in the front and alternating headlights and also a red emergency light on the dash. And on the back I have strobes and alternating red lights. I put those on. I didn't run them constantly. When it appeared to me that he was looking out the rear view mirror, I put my lights on. I did that two (2) or three (3) times down Rees Street and I proceeded on. We turned left on Thibodeaux Street going towards the hospital and he still didn't stop, so I just stayed behind them. And then he pulled in the parking lot at Glenn Soileau's office.
Q. And what happened at that point?
A. I saw Glenn Soileau sit up in the back seat and he got out of Eldridge Menard's vehicle. He was in the back seat. He walked to my car. He told me he didn't have time to talk to Eldridge and asked if I would allow him the time to talk to him. I said, "Sure. Go ahead and talk to him and call me." He said, "Just wait." Then Glenn said he didn't have the key to his office; so they left and they came back about a half hour later. Again I indicated to Glenn at that time what my intentions were and was asking for Eldridge's cooperation in this to search his home and also his storage building, and Glenn never indicated to me that he represented him. He said he talked to Eldridge at that time, and we were all together. Eldridge said he would even provide me with receipts for every piece of wood and everything that he purchased on the house. We were in agreement to that. We left. Eldridge came with us to his house. We search the house. We left and we went there afterwards to search the storage building.
According to Lieutenant Guidry, Soileau was not present during the search of Menard's house and storage facility. Lieutenant Guidry testified that Soileau's office and Menard's house and storage facility are all within a mile of each other. On cross-examination, Lieutenant Guidry testified that he did not find any stolen property in Menard's home.
*1126 During his own testimony, Soileau testified differently as to the activities that occurred around June 14 and 17, 1999:
Q At some point in time didn't Lieutenant Guidry and Detective Boyd show up at your house looking for, looking for you to discuss that matter with you and Mr. Menard and his wife, Pauline, were backing at the, out of your driveway.
A Well, I don't think that's the way it happened. No, Eldridge came to my house and said that Marcus was following him around town. I told him he was paranoid. I didn't think Marcus was following him around town, and while he, while I was sitting outside in my house talking to Eldridge, Marcus passed, Marcus and the other detective passed in front of my house.
Q Well, at some point that day, did you have the occasion thereafter, after you saw Marcus pass in front of your house allegedly, did you have the occasion to speak with Detective Guidry, or Lieutenant Guidry?
A I don't remember.
Q Isn't it, in fact, true that Eldridge and Pauline backed out of the driveway and that's when Lieutenant Guidry and Detective Boyd got behind the vehicle and attempted to stop the vehicle and that, and it stopped after making several blocks, at your law office and you were hiding in the back seat of the vehicle?
A No. They never attempted to stop. I told Eldridge I didn't think Marcus was following him around. I got in the back seat and I got down just to see if Marcus would follow us and I said, "Go to my office," and he followed, he followed us to the office. Never attempted to stop us, never turned on the red light or siren or attempted to passMarcus was following him around.
Soileau testified that he never denied Lieutenant Guidry cooperation, although Lieutenant Guidry apparently felt like he did.
At the hearing, Soileau was questioned about his criminal record, and he testified that he had been convicted of disturbing the peace, injuring public records and twice violating a migratory game law. Soileau was also disciplined by the Louisiana Disciplinary Board. According to Soileau, he was suspended for both the migratory bird violation and the disturbing the peace conviction. When asked if he had been suspended for making a false statement of material fact in federal court, Soileau responded, "That was all the migratory bird violation." The following colloquy then took place:
Q That's, that's a violation of the Migratory Bird Treaty Act, making a false statement to the federal magistrate?
A WhateverI, I indicated to you that I was suspended for the migratory bird violation, whatever the, the statement was in regard to that, that's what I was suspended for.
Q So, are you acknowledging that you were, in fact, suspended for making, intentionally making a false statement to the federal magistrate?
A I'm telling you that the record speaks for itself. Everything was in regard to the migratory bird violation.
Soileau also admitted that Kyle Jones had filed a complaint against him in connection with his representation of Kyle for the theft at issue. According to Soileau, the complaint had been dismissed until the State called the Office of Disciplinary Counsel.
Gerald Block, an attorney who represented Menard sometime after Soileau represented him, testified that he spoke with Soileau on September 21, 2001. According to Block, Soileau was concerned about what the district attorney's office *1127 had to say about him. Block described Soileau's visit as a "fact-finding mission to see what areas of interest the D.A.'s office might have regarding him." According to Block, Soileau was interested in whether the district attorney was investigating him for criminal activity. According to Soileau, however, he met with Block to discuss Menard's case. A recording of Soileau's meeting with Block was admitted into evidence.
Kyle Jones testified that, he was stealing building materials and selling them to support his drug habit. He testified that pursuant to Soileau's advice, he confessed to his involvement in the thefts. In court, Kyle identified Mr. and Mrs. Menard as persons to whom he had sold the stolen materials. When asked if he learned at some point that Soileau was actually working against him, Kyle said yes and related the phone call that he received from Soileau concerning the key to the storage building. After Kyle related the specifics of the phone conversation, the following colloquy took place between the State and Kyle:
Q. Particularly, do you remember what items you were being charged for?
A. Colonial doors, wood flooring.
Q. You in fact did steal those Colonial doors and the wood flooring. Is that correct?
A. Yes, I did.
Q. And what had you done with them prior to that date that you had that conversation?
A. I sold them to Eldridge Menard.
Q. Okay. Did you ever tell Glenn Soileau that you had a storage facility?
A. Never did.
Q. Did you ever tell Glenn Soileau that you had access to a storage facility?
A. Never did.
Q. Did you ever tell Glenn Soileau that you had a key to a storage facility?
A. Never did.
Q. Did you ever tell him that you had stolen material in storage somewhere?
A. Never did.
Q. Did you ever tell him that you had stolen materials stored at your father's property in Cecilia?
A. Never did.
Q. Did you ever store any of the materials that you stole anywhere else other than at your house Alva (*Spelled phonetically) Drive?
A. No.
Kyle testified that he was promised nothing in exchange for his testimony. Kyle further testified that, in November of 2001, Soileau asked Kyle not to hurt him and Soileau would make sure that Kyle would not go to jail. According to Kyle, Soileau also stated that Menard would be on his own.
On cross-examination, Kyle admitted that he continued to steal materials after his confession on May 18, in order to support his drug habit. Kyle also admitted that he cooperated with police with the intention of getting some eniency. Subsequently, however, he stated that he was not expecting anything when he chose to cooperate on May 18. When asked if he had previously testified that he sold doors to Menard, Kyle replied, "Yes." Defense counsel then directed Kyle to his May 18 statement, wherein Kyle was asked if "he" picked up any doors from Kyle. In the statement, Kyle responded, "No, no doors." He responded further in the statement: "He never bought doors." "You see, he is not even ready for doors yet now." When asked which statement was truethe statement he made on May 18 or his statements in courtKyle responded, "I am not too good with dates. *1128 Okay? But at that time, maybe I hadn't delivered the doors yet. Okay? At that particular time." Kyle explained that he either had not delivered the doors yet or was lying when he made the statement. When asked if he could have been lying to the detectives, Kyle replied, "Yes, of course." Later, defense counsel asked Kyle if he was telling the truth on May 18, and Kyle responded:
Yes, I was. No, no, I wasn't. Now I remember. Let me tell you what happened with that. Okay? This particular place that I burglarized, okay, the colonial doors, the white colonial doors, to my knowledge, they didn't know, the cops didn't know anything about that particular job. So the easiest thing for me to do not to be charged with that particularwith the doors was to say I didn't have the doors. My knowledge of the doors came when the doors were returned.
Kyle retained the services of Attorney Josyln Alex in the present matter. Defense counsel asked Kyle if he remembered Ms. Alex's office asking him to give a statement about Menard's involvement. Kyle stated that he did not. When defense counsel asked Kyle if he remembered giving a tape-recorded statement in Ms. Alex's office, Kyle stated that he did not. Defense counsel then played a statement taken by Espinola Quinn in Ms. Quinn's home. Ms. Quinn apparently worked for the Law Office of Josyln Alex. According to the transcript, a great deal of the tape was unintelligible, but Kyle identified his voice as the voice on the tape. Kyle testified that he did remember giving a statement to Ms. Quinn, whom he knew was an investigator for Ms. Alex. When asked what he said on the statement, Kyle responded, "I am not sure what I said, but I think I said something I never sold any, anything to Elridge [Menard]." Kyle stated that he lied because Menard offered to pay him $50.00. Lieutenant Guidry thought that he remembered Kyle stating that Menard offered him $500.00. Kyle testified that both Mr. and Mrs. Menard were present during the statement even though the tape recording does not indicate they were present. Lieutenant Guidry testified that he spoke with Mrs. Menard on September 20, 2001, at which time, Mrs. Menard stated that she and Mr. Menard were [present during Kyle Jones' statement to Ms. Quinn. Lieutenant Guidry also testified that he and the other detectives were able to corroborate much of the information given to them by Kyle.
Last, Lieutenant Guidry testified as to the following conversation he had with Menard as to why Menard's fingerprints may be on some of the wood flooring:
A. When we left Glenn Soileau's office, we went straight to Eldridge Menard's house. WhileOnce we had completed the search, I was talking to Eldridge outside. Pauline was present. And I asked Eldridge if he had ever purchased anything from Kyle Jones, and he adamantly denied ever purchasing anything. As a matter of fact, he refused to allow him on his property. I asked him again if he ever purchased any tiles, he denied it. I asked him if he ever purchased any oak wood floor, he denied that. At that point, after him denying it, I asked him if there would be any reason why, you know, his fingerprints would be found on the wood tile in the event we tested it. He said, "Well, you probably will find my fingerprints on there because, ..." he said, "... Kyle did drive up to my house. He parked on the back street." and he said, "I handled three (3) boxes of the wood tile." And Pauline proceed to answer a question and Eldridge told her to shut up.
*1129 Later, Lieutenant Guidry admitted that he did not know if any of Menard's fingerprints were on the wood flooring. Finally, Lieutenant Guidry testified that he did not investigate any type of conspiracy that may have existed between Menard and Soileau. Lieutenant Guidry had no physical evidence of a conspiracy.
At the conclusion of the hearing, the trial court questioned whether a criminal conspiracy had been shown, and the following colloquy took place:
BY THE COURT:
... I am still at a loss to understand what criminal conspiracy exists between Mr. Menard and Mr. Soileau. What is the State's contention of to state criminal conspiracy? What did Mr. Soileau do other than deliver property back to Lafayette Police Department that they had requested?
BY MR. VINES:
What he did, Your Honor, is he lead the Lafayette detectives to believe that Kyle Jones had the stolen wood flooring and interior doors that were actually delivered to them on the 19th, when in fact it was Eldridge Menard who possessed those items. And that is indicated by a number of elements of evidence that we will put on. Not only Kyle Jones's testimony, but the testimony of Marcus Guidry that Mr. Menard indicated that his prints would be on those items, and the fact that if Mr. Soileau
BY THE COURT:
If Mr. Soileau did that, if he did mislead the Lafayette Police Department as to where the items came from, how is that a criminal conspiracy?
BY MR. VINES:
And also who possessed them.
BY THE COURT:
And so what if he was mislead on who possessed them?
BY MR. VINES:
Mislead them, mislead them to assist Eldridge Menard in avoiding arrest and prosecution.
BY THE COURT:
And if he had previously represented Eldridge Menard in the past and if he had spoken to him about this particular case, then that would be the attorney/client privilege.
BY MR. VINES:
No, sir, Your Honor. Not if you look at the exception to the 506 privilege. If Kyle ...
BY THE COURT:
I understand if Mr. Soileau participated in the hiding of the materials he might be a co-conspirator. I understand if he participated in the sale or the purchase; but if he is a delivery person to assist the police pursuant to their specific request that he become involved and help and assist them in the return of the items, I am just at a loss to understand how that makes him a conspirator to anything. Even if he is lying about who he talked to. Even if he is the one that went get the material and brought it back to his office. He was doing that because Lafayette Police Department asked him to do that it would seem.
BY MR. VINES:
But his statements are that Kyle Jones possessed and he is leading them to believe that Kyle Jones was involved in this criminal conspiracy, criminal conduct, rather than ...
BY THE COURT:
I am not sure what difference, if any, that would make, whether he is leading Lafayette to believe Kyle Jones ...
BY [THE COURT]:

*1130 If his actions are in furtherance of a crime or a fraud.
BY [MR. VINES]:
What fraud? There is no doubt that Kyle Jones was the thief who took the building materials and sold them according to Mr. Jones to Eldridge Menard. So I mean he is not covering up anyone else's crime other than this own clients. And it is illegal for him to do so. And if you look at State v. Taylor, which I have attached to this memo, and I will brief it further, it is a case which I think is similar in that the defendant's attorney went to the defendant's house and took a gun that was used in the commission of a crime and brought it to his office and tried to claim privilege and tried to avoid testimony on that issue. And that was the issue.
BY THE COURT:
Okay. That is the issue we need to hone in on.
BY MR. VINES:
Right. And it is almost right on point in State v. Taylor where the Court said that the privilege was there and that there was an attorney/client relationship; however the exception applied because, even though it was confidential communications between the defendant and the lawyer with regard to where the murder weapon was located and where it was placed and that the defense attorney went and picked it up and brought it to his office and tried to claim privilege, the Court said, no, he could be compelled to testify and that the exception to the privilege article applied.
BY THE COURT:
Was it clear in that case that the gun was obtained from the defendant's home?
BY MR. CALOGERO:
Yes, it was, Your Honor.
BY MR. VINES:
Yes, it was.
BY THE COURT:
Whereas in this case it is not clear at all where the building materials were obtained from or by whom for that matter.
BY MR. VINES:
Well now, I think if you look at what Mr. Menard has said, I think if you look at what Mr. Soileau has said ...
BY THE COURT:
Mr. Soileau hasn't said anything.
BY MR. VINES:
... and you look at his complete lack of credibility, I think it is clear.
We also contested that there was never an attorney/client relationship in this matter.
BY THE COURT:
Well, it just depends on what you mean by "attorney/client relationship". I know there was an attorney/client relationship because we have a check showing that Eldridge Menard paid Glenn Soileau to represent him in this case.
BY MR. VINES:
And of course all you have is the testimony of Glenn Soileau as to whether or not it was with regard to this particular case, and the State's position is ...
BY THE COURT:
I don't know. I examined in-camera the written notes of the conversation which do fall under the privilege, and I am satisfied that it was with respect to this case. But at any rate ...
BY MR. VINES:
And then that is your prerogative, Your Honor, but our argument, of course, is that notes could also be fabricated and it would not be beyond the *1131 realm of possibility with a witness as Glenn Soileau. That is all, Your Honor.
BY THE COURT:
I understand.
BY MR. CALOGERO:
Judge, he is correct that there was... (Unintelligible). I have heard nothing. I heard officers in the case testify at length and neither one of them, in response to my questions, say they investigated any conspiracy or knew of any conspiracy committed by Glenn Soileau. So I am not sure ...
On August 23, 2002, the trial court rendered a thirteen-page ruling, finding that an attorney-client relationship existed between Soileau and Menard and finding that the State proved by a preponderance of the evidence that a conspiracy existed between Soileau and Menard, thereby vitiating the attorney-client privilege. The trial court held that "[c]ommunications between the two which would otherwise be protected are therefore subject to discovery by the State and may be used at trial, subject to the other applicable rules of evidence." The trial court summarized the State's claim as follows: "The State claims that Mr. Soileau participated in a criminal conspiracy with Elridge and Pauline Menard to avoid their arrest and prosecution in this matter by deliberately providing false and misleading information to the police in an attempt to cover-up and conceal their criminal activities."
Vitiation of Attorney-Client Privilege
As previously discussed, in its Motion to Determine Status of Counsel, the State urged the court to find that no attorney client relationship existed or had existed between Menard and Soileau, and that Soileau could be compelled to testify at Menard's trial as well as disclose his files, papers, documents, receipts, correspondence and memoranda prepared in connection with his alleged representation of Menard. The court found, however, that an attorney-client relationship existed between Menard and Soileau, and the State is not contesting that finding. Thus, the issue is not before this court, and the trial court's ruling will not be disturbed.
The trial court further found that even though an attorney-client relationship existed, the attorney-client privilege was vitiated because it found that the State proved by a preponderance of the evidence that Menard and Soileau were engaged in a conspiracy to conceal Menard's involvement in the theft. At the conclusion of the April 10, 2002 hearing, the State argued that Menard and Soileau's attorney-client privilege was vitiated because their communications were made in furtherance of a crime or fraud.
There were two issues before the trial court. One issue concerned whether the attorney-client privilege was vitiated because communications were made in furtherance of a crime or fraud, thereby rendering the communications discoverable and possibly admissible. The applicable statutory provision is La.Code Evid. art. 506, which defines the scope of the attorney-client privilege as well as the exceptions to the privilege. The other issue (raised in the State's second motion) concerned the admissibility (or at least potential admissibility) of statements made during a conspiracy. The applicable evidentiary provision is La.Code Evid. art. 801(D)(3)(b), which provides for the classification of statements made in furtherance of a conspiracy as non-hearsay "provided that a prima facie case of conspiracy is established." A finding that a statement is non-hearsay facilitates the admission of the statement at trial provided that other evidentiary provisions are satisfied. Unlike Article 506, Article 801(D)(3)(b) is not a means of discovery.
*1132 Louisiana Code of Evidence Article 506(B) details the scope of the privilege and provides, in pertinent part:
A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication, when the communication is:
(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.
An exception to the privilege applies, however, when the communication is "[m]ade in furtherance of a crime or fraud." La.Code Evid. art. 506(C)(1)(b). In State v. Taylor, 502 So.2d 537 (La.1987), the supreme court explained the crime or fraud exception to the attorney-client privilege.
In order to understand the crime or fraud exception to the attorney-client privilege, it must be remembered that the purpose of the privilege is to encourage the client to make full disclosure to his counsel so as to ensure competent and ethical representation. In Re Berkley & Co., Inc., 629 F.2d 548, 554 (8th Cir.1980). However,
[t]he reasons for the privilege "all cease to operate ... where the desired [legal] advice refers not to prior wrongdoing, but to future wrongdoing:" In Re Murphy, 560 F.2d [326,] 337 [(8th Cir.1977)], quoting 8 Wigmore [on Evidence, § 2298] at 573 [(McNaughton rev.1961)] (emphasis in original). When the attorney-client relationship has been thus abused [, there is] no justification for sustaining the privilege in any context.

Berkley & Co., supra, at 555. Hence, "attorney-client communications `in pursuit of a criminal or fraudulent act yet to be performed [are] not privileged in any judicial proceeding.'"Berkley & Co., supra, at 555, citing In re Sawyer's Petition, 229 F.2d 805, 808-09 (7th Cir.), cert. denied sub nom. Sawyer v. Barczak, 351 U.S. 966, 76 S.Ct. 1025, 100 L.Ed. 1486 (1956) (emphasis added by court in Berkley & Co.)). Therefore, if the communications between Fish and defendant were made in pursuit of a criminal or fraudulent act yet to be performed (such as conspiracy to secrete relevant evidence), then those communications are not protected by the attorney-client privilege.

Id. at 540 (footnote omitted).
Having established that the attorney-client privilege may be vitiated, the supreme court addressed the standard by which the state must establish the vitiating conduct. The court rejected the state's argument that it was "required to establish only a prima facie case of the underlying conspiracy in order to vitiate the attorney-client privilege." Id. at 541. The state in Taylor attempted to use by analogy the prima facie burden of proof set forth in La.R.S. 15:455, which at that time provided for the co-conspirators' exception to the hearsay rule, the predecessor to La.Code Evid. art. 801(D)(3)(b). Acknowledging the burden of proof set forth in La.R.S. 15:455, as well as federal court cases that had applied the prima facie burden of proof, the court in Taylor found "[n]evertheless, ... the prima facie standard of proof does not afford adequate protection to the attorney-client privilege in criminal cases." Taylor, 502 So.2d at 541. The court stated further:

*1133 Because of the importance of the privilege, therefore, we hold that the state must prove by a preponderance of the evidence that the attorney-client relationship was intended to further continuing or future criminal or fraudulent activity in order to vitiate the attorney-client privilege. Our holding is supported by Comment (e) to Article 801D(3)(b) of the Proposed Evidence Code, which suggests that the appropriate standard of proof to invoke the co-conspirators exception to the rule against hearsay is a preponderance of the evidence.
Id. at 541-42 (footnote omitted).
The court in Taylor stated that its finding was supported by the comments to the proposed evidence Article 801(D)(3)(b). The version of La.Code Evid. art. 801(D)(3)(b) that was actually adopted, however, provides for the prima facie standard. Official Comment (c) to Article 801(D)(3) states that the prima facie standard was retained by Senate Committee amendment. Although one could argue that Taylor's holding was eroded by the retention of the prima facie standard in La.Code Evid. art. 801(D)(3)(b), Taylor has not been overruled and has, in fact, been followed by the fourth circuit in State v. Bright, 96-0280 (La.App. 4 Cir. 6/12/96); 676 So.2d 189. Furthermore, Taylor addressed the standard of proof that should be used in finding a vitiation of the attorney-client privilege pursuant to La.Code Evid. art. 506. The appropriate standard of proof for La.Code Evid. art. 801(D)(3)(b) was not at issue before the court, and the court cited the comments to the proposed article as persuasive authority only. Thus, the legislature's failure to enact the preponderance of the evidence standard for Article 801(D)(3)(b) does not affect the viability of that standard for purposes of vitiating the attorney-client privilege under Article 506. The trial court in the present case was correct in its finding that the preponderance of the evidence standard is the appropriate standard.
In finding that the preponderance standard was satisfied in the present case, the trial court stated that "[t]here was an abundance of testimony at the preliminary hearings which indicate that Mr. Soileau and Mr. Menard conspired to conceal criminal activities." After recounting the pertinent testimony, the trial court addressed defense counsel's argument that Kyle Jones' testimony was not credible. Noting Kyle's admission to stealing because of a bad drug habit, his inconsistent statements as well as his admission to lying in certain statements, the trial court recognized that standing alone, Kyle's testimony was not credible. The court concluded, however, that Kyle's testimony regarding the phone call he received from Soileau was supported by Agent Batiste's testimony and, thus, could be considered. In reaching its conclusion, the trial court also noted that "Soileau's testimony regarding events that arose during the investigation of Mr. Menard by the Lafayette Police Department and the St. Martin Parish Sheriff's Office was not supported by any of the other witnesses' statements." In fact, the court noted, "Soileau's testimony was often in direct conflict with that of the law enforcement officers and other reliable witnesses." The court concluded, "All of the evidence taken as a whole indicates that, more likely than not, Mr. Soileau was engaged in activities designed to conceal Mr. Menard's participation in criminal activities."
In its brief to this court, defense counsel concedes that Soileau made many different statements concerning his representation of Menard. He also concedes that Soileau attempted to mislead the detectives when *1134 he called Kyle Jones about the location of a key. Finally, he even concedes that Soileau made contradictory statements about whether he or someone else went to the storage facility and removed its contents for delivery to the detectives. However, defense counsel argues, "The State failed to prove any conduct whatsoever on the part of Elridge Menard that proved, directly or circumstantially, his participation in any conspiracy with Soileau to commit any crime." Defense counsel specifically notes the jurisprudence which holds:
Here the emphasis should be placed on the client's actions, since it is the client's right which is prejudiced. McCormick on Evidence, § 89 (Cleary ed. 3rd). Unilateral acts by the attorney while perhaps constituting violations of criminal law and/or ethical canons generally cannot be held to abrogate the client's privilege.
State v. Green, 493 So.2d 1178, 1182 (La. 1986).
Defense counsel further argues that the:
[T]rial court specifically found that neither Soileau nor Kyle Jones were credible in any uncorroborated testimony, crediting Soileau's testimony only as to the existence of the attorney-client relationship with Menard because it was documented by his office file and Kyle Jones's testimony only as to the nature of Soileau's May 19, 1999, phone call to him at the Lafayette Correctional Center because it was corroborated....
Thus, defense counsel claims that, Kyle's uncorroborated assertions that he sold stolen goods to Menard and that Menard paid him to lie about Menard's involvement are incredible and cannot be considered. Applying this same reasoning, defense counsel claims this court should not consider Soileau's assertion that Menard initiated the phone call to him concerning Kyle on May 18, 1999, and should not consider Soileau's assertion to Lieutenant Guidry that he lent his truck to Menard to retrieve the stolen items. Even though Soileau's behavior was bizarre and deceitful, defense counsel claims that no evidence was introduced to show an agreement or concert of action between Menard and Soileau with respect to any criminal activity.
Despite defense counsel's claim that the trial court found Soileau's testimony was incredible, the trial court did not specifically find, as it did with Kyle's testimony, that Soileau's testimony was incredible. It found that Soileau's inconsistencies indicated Soileau's involvement in a conspiracy, but it did not find that Soileau's testimony could not be considered. Thus, this court has considered Soileau's testimony in determining whether sufficient evidence was introduced to prove Menard participated with Soileau in an attempt to secrete evidence.
We find that the evidence was sufficient to prove by a preponderance of the evidence that Menard actively participated with Soileau to move evidence that may have linked Menard to criminal activity.
Finally, defense counsel attempts to distinguish and analogize jurisprudence. In one of the cases cited by defense counsel, State v. Taylor, 502 So.2d 537 (La.1987), Taylor's attorney, sometime after an interview with Taylor in prison, went to Taylor's home and retrieved the murder weapon. Taylor's attorney kept the weapon at his office until confronted by police, at which time the attorney surrendered the weapon. "The defense sought to exclude introduction of the gun as well as any and all testimony from [the attorney] concerning the weapon, its location when retrieved or its subsequent discovery by authorities." Id.at 538 (quoting State v. Taylor, 502 So.2d 534, 537 (La.1986)). "The trial court refused to exclude either the gun or *1135 [the attorney's] testimony." Id. The supreme court first addressed the admissibility of the gun itself and found the gun was admissible provided a proper foundation was established. The court reasoned that "physical evidence connected to the commission of a crime which has been received or recovered by an attorney on account of his representation of a client is not excluded by virtue of the attorney-client privilege." Id. at 539.
Taylor also claimed, however, that the trial court erred in refusing to exclude any testimony by the attorney as to the substance of the interview between him and Taylor. Taylor argued that the crime or fraud exception to the attorney-client privilege was not applicable. The supreme court found, however, that if the communications between the attorney and Taylor were "made in pursuit of a criminal or fraudulent act yet to be performed (such as conspiracy to secrete relevant evidence), then those communications are not protected by the attorney-client privilege." Id. at 540. Because the record before the court was not sufficient to make such a determination, the case was remanded to the trial court for further proceedings.
In State v. Green, 493 So.2d 1178 (La. 1986), another case cited by the defendant, Green's attorney found the weapon used in the shooting for which Green was charged. The attorney found the weapon while searching through personal effects left at his office for safekeeping. The attorney contacted authorities and turned over the weapon. Two issues were before the supreme court: 1) the admissibility of the gun itself and 2) the questioning of the attorney regarding the gun. The court found that the gun was not protected by the attorney-client privilege and thereby admissible because an attorney has an obligation to turn over such evidence. As to the questioning of Green's attorney, the court found that "the `information' sought by the state from [the attorney] was his knowledge of Green's possession of the gun prior to its surrender to the police authorities." Id at 1184. The supreme court found that this information was protected by the attorney-client privilege and since the interrogation of the attorney revealed such information, the trial court erred in allowing the interrogation. The court further stated, "Our holding today mandates the state prove the connection between a piece of physical evidence and the defendant without in any way relying on the testimony of the client's attorney who initially received the evidence." Id. The supreme court did not discuss whether the attorney-client privilege was vitiated in any way. There appeared to be no evidence of an attempt by the attorney and Green to secrete the gun.
Lastly, in State v. Bright, 96-0280 (La. App. 4 Cir. 6/12/96); 676 So.2d 189, the fourth circuit addressed the issue of whether the defense could be forced to produce the defendant's diary, if he had disclose to whom he gave the diary, if he gave it to someone else, or disclose the diary's location if he does not have it. Citing bothTaylor and Green, the fourth circuit found the trial court correctly found that the attorney must produce the diary or must tell to whom he gave it. The court also found, however, that absent a preponderance of the evidence that Bright and his attorney conspired to commit a fraudulent act by moving the diary, any communications from Bright to his attorney concerning the diary's whereabouts remain privileged. The court remanded the case with the following instructions:
We remand this case for an evidentiary hearing as per State v. Taylor, supra, to determine whether, if counsel does not have the diary in his possession but knows of its whereabouts, such knowledge *1136 is only because of a communication made by the relator. If this is found to be the case, then the State will have the opportunity to show by a preponderance of the evidence that this communication between counsel and the relator would be exempt from the attorney-client privilege.
Id. at 195.
Defense counsel in the present case compares the present case to Taylor and Green by stating:
Like the lawyer in Green, Soileau turned over the physical evidence (the stolen property) to the authorities; unlike the lawyer in Green but like the lawyer in Taylor, he was not merely a passive recipient of the evidence, but exerted himself to seek out and retrieve the evidence; unlike the lawyer in Taylor, he did this not at the behest or instruction of a client but pursuant to requests by the authorities....
Defense counsel has failed to show that Taylor, Green or Bright mandate a finding in the present case that the communications are subject to the attorney-client privilege. Both Green and Taylor approved a finding that the attorney-client privilege is vitiated if the state shows that the attorney and the client conspired to secrete relevant evidence. The State has satisfied that burden in the present case. The fact that the officers in the present case asked for the retrieval of the stolen items is of no moment. As in Green, Soileau's knowledge that the stolen items were in Menard's possession before they were turned over to police is ostensibly the "information" sought by the State. If Soileau had simply assisted police in recovering the stolen items as requested, it is possible that any communications between him and Menard would be subject to the attorney-client privilege. According to Detective Manceaux, however, Soileau told police that Menard had not purchased the stolen items, and Soileau gave inconsistent statements about how the items were recovered. Because of this evidence as well as evidence that Menard participated with Soileau in the cover-up, the State has proved by a preponderance of the evidence that Soileau and Menard's communications were for the purpose of moving the stolen items so as to disconnect them from Menard. The trial court correctly found that the attorney-client privilege was vitiated.
Classification of Statements as Non-hearsayLa.Code Evid. art. 801(D)(3)(b)
As previously discussed, the State also filed a "Motion for Pretrial Determination of Establishment of Prima Facie Case of Conspiracy pursuant to Louisiana Code of Evidence Article 801D(3)(b)." Louisiana Code of Evidence Article 801D provides, in pertinent part:
Statements which are not hearsay.A statement is not hearsay if:
....
(3) Relational and privity admissions. The statement is offered against a party, and the statement is:
....
(b) A statement by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy is established[.]
In this motion, the State notified the defense of its intent "to introduce statements of declarants while participating in a conspiracy to commit a crime and in furtherance of the object of the conspiracy pursuant to LSA C.E. Art. 801 D(3)(b)." Asserting that the admissibility of a statement pursuant to La.Code Evid. art. 801(D)(3)(b) is conditioned upon a prior determination that a prima facie case of conspiracy exists, the State asked the *1137 court to make such a determination. It appears from the written motion that the State was not asking the court to reach the ultimate issue of whether or not the statements themselves were admissible, but only to make a determination as to whether a prima facie case of conspiracy had been established. Also, at the beginning of the hearing on April 4, 2002, the State asserted that two motions were before the court, one being a "motion for a preliminary determination of whether or not a criminal conspiracy existed so that I might be able to introduce hearsay statements of co-conspirators." Although the arguments at the conclusion of the hearing did not mention the establishment of a conspiracy for purposes of Article 801(D)(3)(b), in its post-hearing memorandum, the State again raised the issue:
Alternatively, in the event this Honorable Court determines that the evidence does not establish by a preponderance of the evidence the existence of a conspiracy, the evidence certainly establishes a prima facie case of a conspiracy. As such, under Art. 801D(3)(b) of the Code of Evidence, the statements of Mr. Soileau may be introduced at the trial of Elridge Menard and Pauline Menard through other witnesses as the statements of a co-conspirator.
It is clear that the State extended its original request for the court to merely determine whether a prima facie case of conspiracy was established for purposes of Article 801(D)(3)(b) to a request for the trial court to actually find Soileau's statements admissible under Article 801(D)(3)(b).
A ruling as to the admissibility of such statements, even if they are discoverable because the attorney-client privilege was vitiated, is premature. Louisiana Code of Evidence Article 801(D)(3)(b) requires not only the establishment of a prima facie case of conspiracy, but also a finding that the statement was made while participating in the conspiracy and in furtherance of the objective of the conspiracy. Such findings are impossible without knowing the substance of the statements themselves and the context within which they were made. The trial court could not properly make a full determination under Article 801(D)(3)(b) that statements made by Soileau were non-hearsay and could be admitted at trial, subject to the satisfaction of other evidentiary rules, i.e., relevancy under La.Code Evid. art. 401 and sufficient probative value pursuant to La.Code Evid. art. 403.
It was premature for the State to even ask the court, as it did in its written motion, to only determine whether a prima facie showing of a conspiracy was established for purposes of Article 801(D)(3)(b)in other words, to ask the court to make only a partial determination as to Article 801(D)(3)(b)'s applicability. Such a finding is proper only after the statements themselves are identified to the court so that the court may be able to make a full determination as to Article 801(D)(3)(b)'s applicability. The State's motion was premature and should not be considered.
The trial court does not mention the Article 801(D)(3)(b) issue. The only discussion of that article in the trial court's written reasons for judgment pertains to the question of whether the preponderance standard or the prima facie standard should apply to determine whether a "conspiracy" has been sufficiently established to vitiate the attorney-client privilege. In the last paragraph of its reasons, the trial court stated:
Testimony adduced at trial establishes by a preponderance of the evidence that a criminal conspiracy did in fact exist between Glenn Soileau and Elridge Menard.

*1138 Mr. Soileau's testimony regarding events that arose during the investigation of Mr. Menard by the Lafayette Police Department and the St. Martin Parish Sheriff's Office was not supported by any of the other witnesses' statements. In fact, Mr. Soileau's testimony was often in direct conflict with that of the law enforcement officers and other reliable witnesses. All of the evidence taken as a whole indicates that, more likely than not, Mr. Soileau was engaged in activities designed to conceal Mr. Menard's participation in criminal activities. Because the court finds that the State proved by a preponderance of the evidence that a conspiracy existed between Glenn Soileau and Elridge Menard, the attorney-client privilege is vitiated. Communications between the two which would otherwise be protected are therefore subject to discovery by the State and may be used at trial, subject to the other applicable rules of evidence.
It is clear from the trial court's opinion that it did not make a determination, even partially, as to Article 801(D)(3)(b)'s applicability. One could possibly argue that the trial court, by stating that the communications may be used at trial, was finding the statements admissible under Article 801(D)(3)(b). In order to make this determination, the trial court would have necessarily had to find that a prima facie showing of a conspiracy had been made. Such an interpretation is not reasonable. No prior mention was made that a prima facie case of conspiracy had been established for purposes of Article 801(D)(3)(b). It is more likely that the trial court was simply stating that the otherwise privileged communications themselves could be admissible because they were no longer privileged, as long as other evidentiary requirements were metincluding Article 801(D)(3)(b). In fact, in its Motion to Determine Status of Counsel, the State had asked for Soileau to be compelled to testify. Thus, the trial court could have been ruling that, since the attorney-client privilege was vitiated, Soileau could be compelled to testify, subject to the other applicable evidentiary rules. Furthermore, as previously discussed, the trial court's ruling would be improper if it actually went so far as to find statements admissible under Article 801(D)(3)(b); because the substance of the statements has not been revealed and no evidence has been presented as to whether they were made in furtherance of the conspiracy. As to the admissibility of statements under this article, we find that the State's motion was premature and not ruled upon by the court.
ASSIGNMENT OF ERROR NO.2:
By this assignment, defense counsel specifically argues that even if this court upholds the trial court's finding of a conspiracy between Menard and Soileau, the State has failed to prove that the attorney-client privilege was vitiated. This argument has been addressed to some extent in Assignment of Error Number 1. Defense counsel also adds, however, that "the State has nevertheless failed to prove that Menard sought or obtained Soileau's professional services in order to enable or aid Menard (or anyone else) to commit or plan to commit what Menard knew or reasonably should have known to be a crime or fraud." Defense counsel further argues:
As with its "proof" of the alleged conspiracy between Menard and Soileau, the State has only speculation and unfounded assumptions to offer as proof that Menard obtained Soileau's legal services to enable Menard to commit or plan to commit any crime or fraud, or that any communications between Menard and Soileau were made in furtherance of a crime or fraud. The State cannot identify any such communications, *1139 let alone demonstrate their existence, other than those contacts and communications which the State's agents repeatedly asked Soileau to make with Menard.
The State has not identified the specific communications between Menard and Soileau that show that the two were moving relevant evidence because the State first had to prove an exception to the attorney-client privilege to be able to discover the specific communications. The State was only required to prove by a preponderance of the evidence that a communication occurred between Menard and Soileau in furtherance of a crime or fraud i.e., moving relevant evidence). As discussed in the previous assignment, the State has satisfied its burden via the actions of Menard and Soileau as well as statements made by Soileau and others. This assignment lacks merit.
ASSIGNMENT OF ERROR NO.3:
Defense counsel claims the trial court's ruling is overly broad because it subjects all communications between Menard and Soileau to discovery by the State. The trial court ruled as follows: "Communications between the two which would otherwise be protected are therefore subject to discovery by the State and may be used at trial, subject to the other applicable rules of evidence." Although it is clear from a reading of the trial court's ruling in its entirety that the trial court intended only those communications made in furtherance of a crime or fraud to be discoverable, the dispositive language is broad. Accordingly, this court amends the trial court's dispositive language to provide as follows: "Communications between Menard and Soileau which were made in furtherance of a crime or fraud are subject to discovery by the State and may be used at trial, subject to the other applicable rules of evidence."

CONCLUSION
The trial court's ruling is affirmed. This court, however, amends the trial court's dispositive language to provide as follows: "Communications between Menard and Soileau which were made in furtherance of a crime or fraud are subject to discovery by the State and may be used at trial, subject to the other applicable rules of evidence."
WRIT GRANTED IN PART AND DENIED IN PART.
PETER, J., dissents and would grant the writ and reverse the trial court's judgment.
NOTES
[1] The defendant is referred to in various places in the record as Elridge Menard and Eldridge Menard. For consistency, he is referred to throughout this opinion as Elridge, except when quoting directly from the record.